**In re GLOBE BUILDING
MATERIALS, INC.,
Debtor.**

**Minnesota Pollution Control
Agency, Plaintiff,**

v.

**Gordon E. Gouveia, Chapter 7 Trustee
of Globe Building Materials, Inc.,
Defendant.**

**Bankruptcy No. 01–60182.
Adversary Nos. 05–6100.**

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

July 21, 2006.

J. Sebastian Stewart, Assistant Attorney General, St. Paul, MN, for Plaintiff.

Janice A. Alwin, Shaw, Gussis, Fishman, Glantz, Wolfson & Towbin, L.L.C., Chicago, IL, for Defendant.

### MEMORANDUM OF DECISION AND ORDER

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

This adversary proceeding, which was initiated by the Minnesota Pollution Control Agency ("MPCA") by a complaint filed on June 27, 2005, seeks injunctive relief to require action by the Chapter 7 Trustee of the bankruptcy estate of Globe Industries, Inc. ("Trustee") to investigate and abate the alleged release of hazardous substances from storage tanks located on a parcel of realty which was once property of the bankruptcy estate. On August 3, 2005, the Trustee filed a motion to dismiss the complaint. The matter is before the Court with respect to that motion to dismiss and the parties' memoranda of law with respect to that motion. The unsettled nature of the law applicable to the issues presented has caused the Court to ponder this decision far longer than is customary.

I. *Standard for a Motion to Dismiss Under Fed.R.Bankr.P. 7012(b)(6)/ Fed.R.Civ.P. 12(b)(6)*

Fed.R.Bankr.P. 7012(b) makes applicable to adversary proceedings Rule 12 of the Federal Rules of Civil Procedure, which provides that a defendant may seek to challenge the complaint by asserting that it fails "to state a claim upon which relief can be granted." The applicable standard for considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6) requires the Court to accept all well pleaded factual allegations in the complaint as true; *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). The pleadings and all reasonable inferences drawn from the pleadings must be construed in a light most favorable to the nonmoving party; *In re Chinin U.S.A., Inc.,* 327 B.R. 325, 331 (Bankr.N.D.Ill.2005) (*citing, Prince v. Rescorp Realty,* 940 F.2d 1104 (7th Cir.1991); *Janowsky v. United States,* 913 F.2d 393 (7th Cir.1990); *Rogers v. United States,* 902 F.2d 1268 (7th Cir. 1990); *Craigs, Inc. v. General Electric Capital Corp.,* 12 F.3d 686, 688 (7th Cir. 1993). However, this Court is neither bound by the plaintiff's legal characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claims. *Scott v. O'Grady,* 975 F.2d 366, 368 (7th Cir.1992). Dismissal with prejudice is only appropriate if it appears that no set of facts could entitle the plaintiff to relief. *In re Chinin U.S.A., Inc.,* 327 B.R. at 331 (*citing, Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957)).

II. *Facts to be Considered by the Court*

As pled by MPCA, the salient facts before this Court are as follows:

1. Plaintiff MPCA is a state agency pursuant to Minn.Stat. § 116.02, subd. 1 (2004). [Plaintiff's Complaint at ¶ 1].

2. Defendant Gordon E. Gouveia is Trustee in the Chapter 7 bankruptcy case of Debtor Globe Building Materials, Inc ("Globe") currently pending before this Court. Defendant is sued in his capacity as Chapter 7 Trustee for Globe's estate. [Plaintiff's Complaint at ¶ 2].

3. Globe filed a voluntary Chapter 11 bankruptcy petition in this Court on January 19, 2001 (the "Petition Date"). On April 4, 2001, Globe converted its Chapter 11 case to a case under Chapter 7. [Plaintiff's Complaint at ¶ 2].

4. This action relates to on-going, postpetition releases into the environment of hazardous substances and storage tank vi-

olations for which Debtor's estate is responsible at its recently-sold property located at and around 1107, 1120, 1130, and 1147 East Seventh Street, St. Paul, Minnesota ("Globe Property"). [Plaintiff's Complaint at ¶ 2].

5. The Debtor purchased the Globe Property in or around 1986. [Plaintiff's Complaint at ¶ 7].

6. While operating its asphalt building materials business on the Globe Property, Globe owned and operated approximately 20 aboveground and underground storage tanks which housed asphalt, fuel oil, and liquid laminate. [Plaintiff's Complaint at ¶ 8].

7. As of the date of the complaint, only four or five of the approximately 20 tanks appear to have been properly taken out of service. The remaining tanks—including all parts of the tank systems—need to be cleaned; have products removed, analyzed, and disposed; valves, openings, and man ways sealed; and labeled as "out of service." Until all of these tasks are completed, approximately 16 tanks on the Globe Property violate state law. [Plaintiff's Complaint at ¶ 9].

8. The following tanks continue to hold product: (a) two 11,000 gallon fuel oil tanks each contain approximately two feet deep of fuel oil combinations; (b) a 45,000 gallon tank holds approximately three feet to four feet deep of what is believed to be asphalt cement oil; (c) a trio of 243,000 gallon, 112,000 gallon, and 64,000 gallon tanks collectively hold 60,000–80,000 gallons of asphalt concrete product. [Plaintiff's Complaint at ¶ 10]. These tanks present imminent threats to public safety due to the fire hazard they pose and the harm a fire or explosion could cause in the middle of a mixed residential and business community that surrounds the Globe Property. [Plaintiff's Complaint at ¶ 11].

9. In March 2001, the MPCA engaged a contractor to investigate a previously discovered petroleum release. Subsequently, the MPCA learned the Debtor had filed a bankruptcy petition. [Plaintiff's Complaint at ¶ 12]. On or around October 8, 2001, the State's contractor forwarded an access agreement to the Trustee's attorney to obtain access to investigate the petroleum release at the Globe Property. [Plaintiff's Complaint at ¶ 13]. After October 8, 2001, the MPCA and its contractor made several written and oral requests to the Trustee for access. The Trustee consented to providing access on or about April 23, 2002. The MPCA's petroleum release investigation at the Globe Property subsequently began. [Plaintiff's Complaint at ¶ 14].

10. The MPCA's petroleum investigation produced two reports. The first report, dated May 23, 2003, indicates that one monitoring well detected hazardous substances at the Globe Property at levels above health risk levels. The contractor's second report dated January 2004 provides conclusive and confirming evidence that hazardous substances are detected at the Globe Property at levels exceeding health risk levels. [Plaintiff's Complaint at ¶ 15].

11. In January 2004, the MPCA was served with the Trustee's Motion to Abandon the Globe Property. The MPCA subsequently responded with its Objection to Abandonment in early 2004. Later, the MPCA learned that the St. Paul, Minnesota Port Authority ("Port Authority"), a local governmental agency, had expressed interest to the Trustee in 2001 to purchase the Globe Property. [Plaintiff's Complaint at ¶ 16].

12. As part of its due diligence, the Port Authority had Phase I and Phase II environmental inspection reports ("Port Authority Reports") generated for the Globe Property. The Port Authority Re-

ports were prepared in April 2003 and July 2003. Those reports document there are on-going, post-petition releases of hazardous substances in the soil and ground water at the Globe Property. [Plaintiff's Complaint at ¶ 17].

13. The Trustee has never reported the releases of hazardous substances at the Globe Property to the MPCA or taken actions to abate, remove, or control the releases. [Plaintiff's Complaint at ¶ 18].

14. In late May 2004, the MPCA received the Port Authority Reports after the Trustee consented to the Port Authority producing them to the MPCA. [Plaintiff's Complaint at ¶ 20].

15. All of the hazardous substances referenced in the Port Authority Reports, and the MPCA's previously filed Objection to Abandonment, have been detected in soil and ground water at the Globe Property. The hazardous substances are present at levels significantly higher than the Minnesota Department of Health's health risk levels ("HRLs") and federal maximum contaminant levels ("MCLs"). HRLs and MCLs represent the maximum concentration of a contaminant in drinking water that Minnesota and federal health departments consider to be safe for human consumption. [Plaintiff's Complaint at ¶ 21].

16. The hazardous substances detected at the Globe Property include Benzo(a)pyrene ("BaP") detected in the soil at 24.6 parts per million ("ppm"). The MPCA's BaP Tier I Soil Reference Value ("SRV") for residential areas is 2 ppm; for industrial sites the SRV is 4 ppm. SRVs provide risk based guidance for evaluating the human health risk caused by exposure to contaminated soil. BaP is a suspected human cancer-causing agent. It causes skin disorders in humans and animals, and it has harmful developmental and reproductive effects. Furthermore, it is bio-accumulative, does not break down easily in the environment, and is subject to long-range air transport. Dermal contact, inhalation, and ingestion are important pathways by which this hazardous substance can enter the body. [Plaintiff's Complaint at ¶ 22].

17. Naphthalene has been detected in the ground water at the Globe Property at between 16,000 parts per billion ("ppb") to 17,000 ppb. The HRL for naphthalene is 300 ppb. Benzene has been detected at between 120 ppb to 190 ppb. Benzene's HRL is ten ppb; its federal MCL is five ppb. Styrene has been detected at 220 ppb, while its MCL is 100 ppb. [Plaintiff's Complaint at ¶ 23].

18. The full extent and magnitude of the soil and ground water contamination at the Globe Property has not been determined by any of the environmental investigations that have occurred to-date. Additionally, the direction and speed of the ground water flow has not been determined. There is a shallow, perched aquifer under the Globe Property that contains high levels of contamination. This perched aquifer presents inhalation threats to humans from vapors escaping from the shallow ground water. Finally, carbon tetrachloride and acetone, which are hazardous chemicals, are present and easily accessible at the Globe Property. [Plaintiff's Complaint at ¶ 24].

19. At the Globe Property, there is evidence of graffiti, food products and packaging, and electrical wiring has been stolen, indicating that trespassers are entering it. The trespassers likely include children and teenagers unaware of the dangerous conditions. [Plaintiff's Complaint at ¶ 25].

The balance of the complaint is comprised of recitation of the legal authorities and legal contentions asserted by MPCA in support of its action.

## III. *Issues Before the Court*

The issues to be determined with respect to the Trustee's motion to dismiss are the following:

A. Does section 1 of the "Relief" section of MPCA's complaint, which seeks an order to compel the Trustee "to perform the environmental investigations and response actions deemed necessary by [MPCA]", state a claim upon which relief may be granted?

B. Does section 2 of the "Relief" section of MPCA's complaint, which seeks an order that "after payment of any previously Court-approved costs of administering the estate", the Trustee is to "apply all remaining assets of the estate as necessary to perform the investigations and response actions deemed necessary by the Minnesota Pollution Control Agency to abate imminent threats to public health, safety and the environment existing at the Globe Property", state a claim upon which relief may be granted?

## IV. *Legal Analysis*

The principal difficulty which the Court has encountered in preparing this order is to conceptually fit the relief requested by MPCA into the framework of the law relating to environmental enforcement issues which arise in bankruptcy cases. A part of this problem arises from the manner in which MPCA has couched its prayer for relief. The first section of that prayer on its face seeks an order by which the Trustee is to be compelled to perform investigatory and response actions at the direction of MPCA. First, the Court construes this section to request that the Trustee be compelled to engage a contractor to perform the required action: This is not a situation in which, for example, an industrial company is violating the Clean Air Act by turning off its smokestack scrubbers, and an abatement order may then be directed to the company to turn the scrubbers on. Obviously, the Trustee can't seal the tanks himself, and thus the first section of the relief portion of the complaint can only be logically construed to seek an order by which the Trustee is compelled to hire someone to perform the requested abatement. Next, if this order were granted, it would entail the Trustee's contracting with a third party for present services, for which that party would expect present payment. In this context, section 2 of the "Relief" portion of the complaint presents an "anomaly at law", in the words of the immortal lawyer/sports commentator Howard Cosell. This section seeks an order by which the Trustee is to be compelled to potentially devote all estate assets other than those necessary to pay administrative expenses *approved by the Court prior to the filing of the complaint* to the requested remediation work. This section thus in essence seeks a structuring of administrative claims (under 11 U.S.C. § 507(a)(1)/11 U.S.C. § 503(b) and 28 U.S.C. chapter 123) in which such claims allowed prior to the filing of the complaint are accorded priority over the costs of abatement, while such claims not yet so allowed become subordinate to the costs of abatement. Yet, if MPCA prevails on the first paragraph of its requested relief, *ipso facto* the Trustee will have to pay for the abatement costs as a **present cost** of administration, thereby elevating the expenses of abatement to a class ahead of even those administrative claims already allowed but not yet paid. Finally, both paragraphs seek to compel the Trustee to do what MPCA directs should be done, rather than requesting relief in accordance with some more objective standard: the equivalent of a request for an administrative super-priority blank check.

Were the Court to construe the prayers for relief literally, a myriad of

issues of Chapter 7 case administration would be implicated which would have no bearing on the bottom line of this action, as that bottom line has been drawn by the briefs of both parties. Moreover, there is no law which in any way supports the blanket request for an order which compels the Trustee to do whatever MPCA directs—environmental laws require compliance with *environment laws,* not with whatever an enforcement agency demands or unilaterally deems the law to be. Thus, to the extent that MPCA seeks an order which requires to Trustee to act in accordance with the dictates of MPCA, as contrasted to the requirements of applicable environmental laws, the complaint fails to state a claim for which relief can be granted, and the Trustee's motion to dismiss would be granted.

But there is more to the complaint than a demand that MPCA get its way. The complaint is to be construed in a light most favorable to MPCA, and thus it is necessary to delineate the scope of relief *which might be available to MPCA under the facts alleged in the complaint.* Ultimately, an action is determined by granting relief to which the party may be entitled, whether or not that relief was demanded; Fed.R.Civ.P. 54(c), made applicable to this adversary proceeding by Fed.R.Bankr.P. 7054.

In order to precisely analyze the issues presented by MPCA's complaint, it is first necessary to delineate both the focus of that complaint and the remedies which the complaint requests of the Court.

First, remedies for enforcement of state and federal environmental laws fall roughly into two categories: abatement and remediation. "Abatement" remedies seek to compel an environmental law violator to take *direct action with respect to the practices* which give rise to alleged violation of the law, while "remediation" remedies seek to restore property to a condition in which the physical qualities of the property satisfy environmental standards. MPCA's complaint seeks abatement, as contrasted to remediation. The factual allegations of the complaint refer nearly exclusively to alleged on-going contamination of a site upon which Globe previously conducted its business and to actions which MPCA contends are necessary to stop that alleged contamination. The focus of the complaint is "approximately 20 aboveground and underground storage tanks", which "housed asphalt, fuel oil and liquid laminate" alleged to have been utilized by the debtor in the operation of its business; [Complaint, ¶ 8]. The complaint alleges that potentially contaminating agents continue to be stored in certain of these tanks, and that investigations indicate on-going seepage of environmentally contaminating agents from the tanks. It is asserted that certain actions are required to be taken with respect to these tanks in order to bring the status of the tanks into compliance with Minnesota law; [Complaint ¶ 9]. The focus of the complaint is clearly upon abatement of alleged illegal storage of potentially environmentally contaminating product in the tanks in violation of state law, and on abatement of release of that product from the tanks, as is made clear by paragraph 59 of the complaint, which states:

> Therefore, pursuant to Minn.Stat. § 115.071, subd. 5, the State of Minnesota is entitled to an Order compelling the Trustee to properly close, seal, and take out of service all of the aboveground and underground storage tanks that are located on the Globe Property as required by state law. Pursuant to 11 U.S.C. § 105(a), the Court is authorized to grant such Order.

The nature of the action is further clearly established by paragraphs 1 and 2 of the

"Relief" portion of the complaint, which state:

1. Ordering Defendant Trustee forthwith *to perform the environmental investigations and response actions deemed necessary* by Plaintiff Minnesota Pollution Control Agency;

2. Order Defendant Trustee, after payment of any previously Court-approved costs of administering the estate, to apply all remaining assets of the estate as necessary to perform the investigations and response actions deemed necessary by the Minnesota Pollution Control Agency *to abate imminent threats to public health, safety and the environment existing at the Globe Property* ... (emphasis supplied).

As previously stated, except in the context of litigation which involves the enforcement of a previously-existing administrative agency order, there is no authority whatever for the proposition that an entity can be compelled to do whatever an administrative agency directs. However, the above-quoted sections of the complaint make clear that MPCA essentially seeks the imposition by the Court of an injunction against the Chapter 7 Trustee which requires the Trustee to respond by spending funds of the estate for abatement actions. For the purposes of ruling on the Trustee's motion, the Court construes Section 1 to request an order by which the Trustee is to be compelled to perform investigations and response actions **required by applicable law to cause the status of the tanks to comply with applicable state environmental laws,** presumably by entering into contracts with state-approved contractors to perform requested actions. Section 2 of the "Relief" section seeks an order of the Court which requires the Chapter 7 Trustee to disburse funds constituting property of the estate to pay

for the actions which the first section seeks to mandate upon the Trustee.

Construed in the manner required by Rule 12(b)(6), the complaint thus seeks injunctive relief by which the Trustee is to be compelled to abate alleged environmental contamination emanating from the storage of alleged contaminating agents in surface and underground tanks located on real property formerly utilized by Globe in the operation of its business, by the Trustee's employment of persons or entities to perform abatement activities and by paying those persons or entities from funds of the Chapter 7 estate which remain after payment of those administrative claims which were approved prior to the filing of the complaint. The primary issue is then whether this request states a claim for relief which may be granted.

■ The record of Globe's Chapter 7 case, of which the Court takes notice solely in this context, establishes that the real property upon which the tanks are located is no longer property of the bankruptcy estate, having been sold pursuant to the Court's order to the Port Authority of the City of Saint Paul pursuant to proceedings under 11 U.S.C. § 363. The issues presented to the Court thus include the concept of whether or not the Court can, or should, order the Chapter 7 Trustee to take abatement action with respect to product storage tanks which may no longer be property of the bankruptcy estate, or if so are located on real property which no longer constitutes property of the bankruptcy estate.

The final preliminary circumstantial factor which will potentially impact the Court's determination is that this case began as a Chapter 11 case filed by Globe Building Materials, Inc., and was subsequently converted to a case under Chapter 7. Upon conversion, no order pursuant to 11 U.S.C. § 721 was entered which author-

ized the Trustee to operate the Debtor's business. Thus, whatever problems may have arisen or may continue to arise from the status of the storage tanks, that problem was inherited by the Chapter 7 Trustee from the former debtor-in-possession and did not derive from actions undertaken by the Trustee pursuant to 11 U.S.C. § 721 in the operation of the business in which the product stored in those tanks was previously used by the Debtor.

This adversary proceeding presents issues which have long been the subject of debate in both Chapter 11 and Chapter 7 bankruptcy cases in which property of the bankruptcy estate is operated, or has become contaminated, in violation of federal and/or state environmental laws. There are many variations on this theme, including violations arising from the debtor's pre-petition actions; violations arising from a post-petition Chapter 11 debtor's continued operation of its business or management of its property; and circumstances in which a Chapter 7 Trustee inherits from the pre-petition debtor either a contaminated site or a facility which contains instrumentalities which do, or may, continue to discharge environmental contaminants. Each of these variations has been met with analyses that are as myriad as are the contaminating agents which gave rise to the circumstances requiring analysis. There are no clearly authoritative answers to a number of issues which arise in bankruptcy cases with respect to environmentally contaminated bankruptcy estate property, or with respect to circumstances which present actual or potential continuing environmental contamination of that property.

Having delineated the specific issues presented to the Court, we now start the analysis of those issues with the observation that the Bankruptcy Code has *no* provision which specifically addresses any of these issues in the context of alleged violations of environmental law by either a debtor or by a bankruptcy trustee. In various sections of the Bankruptcy Code, Congress has seen fit to delineate the interplay between societal concerns and remedies established by federal bankruptcy laws. For example, in 11 U.S.C. § 503(b)(1)(C), Congress has specifically addressed the administrative priority status to be accorded to tax penalties, and by doing so has evidenced its clear intention that these tax penalties take precedence over even priority claims under 11 U.S.C. § 507(a) which are solely compensatory for losses sustained by individuals or entities perhaps deemed more worthy in other eyes of disbursement from a bankruptcy estate than are penalties on post-petition taxes. In 11 U.S.C. § 507(a), Congress has given priorities to creditors having claims for various forms of employment compensation [11 U.S.C. § 507(a)(3) and (4)]; to those having unsecured claims against a debtor arising from loss of stored grain [11 U.S.C. § 507(a)(5)(A)]; for those having claims against a debtor arising from non-payment for fish or fish produce sold to the debtor [11 U.S.C. § 507(a)(5)(B)]; for persons who made deposits for goods or services to be provided to them by the debtor for essentially consumer goods or services, when those goods or services were not provided by the debtor [11 U.S.C. § 507(a)(6)]; and for unpaid pre-petition obligations of a debtor for child support, spousal support, or alimony owed to another person [11 U.S.C. § 507(a)(7)]. Under Chapter 7, there are specific sub-chapters which deal with the liquidation of the businesses of stockbrokers, commodity brokers, and clearing banks. The Bankruptcy Code contains entire chapters which deal exclusively with reorganization of municipalities [Chapter 9] and of family farmers [Chapter 12]. There are specific provisions which deal

with restructuring pension plans by bankruptcy debtors, and with assumption or rejection of leases of aircraft terminals and of aircraft gates. All of the foregoing provisions make clear the concept that when Congress desires to specifically address an issue deemed by it to be of particular social consequence in relation to reorganization or liquidation under federal bankruptcy law, it is more than capable of delineating the issues and providing statutory rules for the interplay between those societal concerns and the general structure of the Bankruptcy Code. It is thus particularly noteworthy that Congress has not specifically legislated provisions into the Bankruptcy Code which address environmental issues. The interplay between bankruptcy law and environmental law has been left to the Courts to determine under general principles of federal bankruptcy law.

As might be expected, both MPCA and the Trustee have presented briefs to the Court which cite judicial determinations favorable to the respective presenting party. While in some contexts there is certainly merit in a court's case-by-case discussion of authorities cited by the parties, this Court prefers to avoid analysis of noncontrolling authorities solely to expostulate on why its opinions do or do not accord with those of others having opinions on the same or similar issues. In the context of the issues presented by this case, there are no "pig" cases [1]: each party can point to decisions from other jurisdictions which support its respective position. However, there are two Supreme Court cases—*Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985) and *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986)—and a statute [28 U.S.C. § 959(b)] which provide the framework for determination of the Trustee's motion to dismiss.

*Kovacs* is only somewhat instructive with respect to the issues in this adversary proceeding. In *Kovacs,* the State of Ohio obtained an injunction ordering William Kovacs to clean up a hazardous waste site. A receiver was subsequently appointed under the provisions of applicable state law, following which Kovacs filed a Chapter 7 bankruptcy case. The specific issue addressed by the United State Supreme Court was whether "Kovacs' obligation under the injunction is a 'debt' or 'liability on a claim' subject to discharge under the Bankruptcy Code", *Kovacs, supra,* at 706.

Ohio filed a complaint in the bankruptcy court by which it sought the court's determination that Kovacs' obligation under the cleanup order was not dischargeable under the Bankruptcy Code because it was not a "debt" under bankruptcy law. That complaint also "sought an injunction against the bankruptcy trustee to restrain him from pursuing any action to recover any assets of Kovacs in the hands of the receiver"; *Kovacs, supra,* at 707. The United States Bankruptcy Court, the United District Court on appeal from the Bankruptcy Court, and the United States Court of Appeals for the Sixth Circuit on appeal from the District Court held that "Ohio essentially sought from Kovacs only a monetary payment and that such a required payment was a liability on a claim that was dischargeable under the bankruptcy statute"; *Kovacs, supra,* at 707.

In deciding that under the circumstances of the case, Ohio's assertions against Kovacs amounted to a claim, the Supreme Court stated:

> Except for the nine kinds of debts saved from discharge by 11 U.S.C. § 523(a), a discharge in bankruptcy discharges the

---

1. A "pig" case is a case on all fours, i.e., squealingly on point and controlling.

debtor from all debts that arose before bankruptcy. § 727(b). It is not claimed here that Kovacs' obligation under the injunction fell within any of the categories of debts excepted from discharge by § 523. Rather, the State submits that the obligation to clean up the Chem-Dyne site is not a debt at all within the meaning of the bankruptcy law.

For bankruptcy purposes, a debt is a liability on a claim. § 101(11). A claim is defined by § 101(4) as follows:

"(4) 'claim' means—

"(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

"(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."

The provision at issue here is § 101(4)(B). For the purposes of that section, there is little doubt that the State had the right to an equitable remedy under state law and that the right has been reduced to judgment in the form of an injunction ordering the cleanup. The State argues, however, that the injunction it has secured is not a claim against Kovacs for bankruptcy purposes because (1) Kovacs' default was a breach of the statute, not a breach of an ordinary commercial contract which concededly would give rise to a claim; and (2) Kovacs' breach of his obligation under the injunction did not give rise to a right to payment within the meaning of § 101(4)(B). We are not persuaded by either submission.

There is no indication in the language of the statute that the right to performance cannot be a claim unless it arises from a contractual arrangement. The State resorted to the courts to enforce its environmental laws against Kovacs and secured a negative order to cease polluting, an affirmative order to clean up the site, and an order to pay a sum of money to recompense the State for damage done to the fish population. Each order was one to remedy an alleged breach of Ohio law; and if Kovacs' obligation to pay $75,000 to the State is a debt dischargeable in bankruptcy, which the State freely concedes, it makes little sense to assert that because the cleanup order was entered to remedy a statutory violation, it cannot likewise constitute a claim for bankruptcy purposes.

. . .

The courts below also found little substance in the submission that the cleanup obligation did not give rise to a right to payment that renders the order dischargeable under § 727. The definition of "claim" in H.R. 8200 as originally drafted would have deemed a right to an equitable remedy for breach of performance a claim even if it did not give rise to a right to payment. [FN6] The initial Senate definition of claim was narrower, [FN7] and a compromise version, § 101(4), was finally adopted. In that version, the key phrases "equitable remedy," "breach of performance," and "right to payment" are not defined. See 11 U.S.C. § 101. Nor are the differences between the successive versions explained. The legislative history offers only a statement by the sponsors of the Bankruptcy Reform Act with respect to the scope of the provision:

FN6. H.R. 8200, 95th Cong., 1st Sess., 309–310 (House Committee print 1977), as reported September 8, 1977.

FN7. See S. 2266, 95th Cong., 1st Sess., 299 (1977), as introduced October 31, 1977.

"Section 101(4)(B) ... is intended to cause the liquidation or estimation of contingent rights of payment for which there may be an alternative equitable remedy with the result that the equitable remedy will be susceptible to being discharged in bankruptcy. For example, in some States, a judgment for specific performance may be satisfied by an alternative right to payment in the event performance is refused; in that event, the creditor entitled to specific performance would have a 'claim' for purposes of a proceeding under title 11." [FN8]

FN8. 124 Cong.Rec. 32393 (1978) (remarks of Rep. Edwards); see also *id.,* at 33992 (remarks of Sen. DeConcini).

We think the rulings of the courts below were wholly consistent with the statute and its legislative history, sparse as it is. The Bankruptcy Court ruled as follows, *In re Kovacs,* 29 B.R. at 818: "There is no suggestion by plaintiff that defendant can render performance under the affirmative obligation other than by the payment of money. We therefore conclude that plaintiff has a claim against defendant within the meaning of 11 U.S.C. § 101(4), and that defendant owes plaintiff a debt within the meaning of 11 U.S.C. § 101(11)."

. . .

The District Court affirmed, primarily because it was bound by and saw no error in the Court of Appeals' prior opinion holding that the State was seeking no more than a money judgment as an alternative to requiring Kovacs personally to perform the obligations imposed by the injunction. To hold otherwise, the District Court explained, "would subvert Congress' clear intention to give debtors a fresh start." App. JA–

16. The Court of Appeals also affirmed, rejecting the State's insistence that it had no right to, and was not attempting to enforce, an alternative right to payment: "Ohio does not suggest that Kovacs is capable of personally cleaning up the environmental damage he may have caused. Ohio claims there is no alternative right to payment, but when Kovacs failed to perform, state law gave a state receiver total control over all Kovacs' assets. Ohio later used state law to try and discover Kovacs' post-petition income and employment status in an apparent attempt to levy on his future earnings. In reality, the only type of performance in which Ohio is now interested is a money payment to effectuate the Chem–Dyne cleanup."

\* \* \*

"The impact of its attempt to realize upon Kovacs' income or property cannot be concealed by legerdemain or linguistic gymnastics. Kovacs cannot personally clean up the waste he wrongfully released into Ohio waters. He cannot perform the affirmative obligations properly imposed upon him by the State court except by paying money or transferring over his own financial resources. The State of Ohio has acknowledged this by its steadfast pursuit of payment as an alternative to personal performance." *[In re Kovacs,]* 717 F.2d [984], at 987–988 [(6th Cir.1983)].

As we understand it, the Court of Appeals held that, in the circumstances, the cleanup duty had been reduced to a monetary obligation.

We do not disturb this judgment.

*Kovacs,* 105 S.Ct. at 707–709.

*Kovacs'* influence on the instant case is in its determination that the injunctive relief sought by MPCA is simply a demand for the payment of money, to the

extent of the cost of abatement of the environmental hazards caused from alleged seepage from the storage tanks on Globe's former business premises. *Kovacs* solely stands for the principle that a pre-petition remediation order, which requires the debtor to expend money in order to comply with it, constitutes a pre-petition claim subject to discharge in that debtor's Chapter 7 case, particularly when the pre-petition actions included within the scope of the order dispossess the debtor of the property which he was required to remediate. This latter concept is simply a reflection of the fact that in order to take action on property which he did not control, the debtor's sole recourse would have been to pay money for another entity to perform remediation action. To the extent that *Kovacs* has any direct influence on the instant adversary proceeding, it is limited to the proposition that MPCA's request for injunctive relief is simply another way of stating that MPCA wants the cost of the requested abatement actions to be paid by the bankruptcy estate.[2]

*Kovacs* contains some fascinating *dicta* which but for the fact that it is *dicta* would have particular relevance to this case. The *Kovacs* Court stated:

It is well to emphasize what we have not decided. First, we do not suggest that Kovacs' discharge will shield him from prosecution for having violated the environmental laws of Ohio or for criminal contempt for not performing his obligations under the injunction prior to bankruptcy. Second, had a fine or monetary penalty for violation of state law been imposed on Kovacs prior to bankruptcy, § 523(a)(7) forecloses any suggestion that his obligation to pay the fine or penalty would be discharged in bankruptcy. *Third, we do not address what the legal consequences would have been had Kovacs taken bankruptcy before a receiver had been appointed and a trustee had been designated with the usual duties of a bankruptcy trustee. [FN12] Fourth, we do not hold that the injunction against bringing further toxic wastes on the premises or against any conduct that will contribute to the pollution of the site or the State's waters is dischargeable in bankruptcy; we here address, as did the Court of Appeals, only the affirmative duty to clean up the site and the duty to pay money to that end. Finally, we do not question that anyone in possession of the site—whether it is Kovacs or another in the event the receivership is liquidated and the trustee abandons the property, or a vendee from the receiver or the bankruptcy trustee—must comply with the environmental laws of the State of Ohio. Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions.* As the case comes to us, however, Kovacs has been dispossessed and the State seeks to enforce his cleanup obligation by a money judgment.

FN12. The commencement of a case under the Bankruptcy Code creates an estate which, with limited exceptions, consists of all of the debtor's property wherever located. 11 U.S.C. § 541. The trustee, who is to be appointed promptly in Chapter 7 cases, is charged with the duty of collecting and reducing the property of the estate and is to be accountable for all of such property. 11 U.S.C. § 704. A custodian of the debtor's property ap-

---

**2.** As an underscore of this point, MPCA has filed a request for payment under 11 U.S.C. § 503(b)(1), which is proceeding separately from, and subsequently to, the matters at issue in this adversary proceeding.

pointed before commencement of the case is required to deliver the debtor's property in his custody to the trustee, unless the bankruptcy court concludes that the interest of creditors would be better served by permitting the custodian to continue in possession and control of the property. 11 U.S.C. § 543. After notice and hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value to the estate. 11 U.S.C. § 554. Such abandonment is to the person having the possessory interest in the property. S.Rep. No. 95–989, p. 92 (1978). Property that is scheduled but not administered is deemed abandoned. 11 U.S.C. § 554(c). *Had no receiver been appointed prior to Kovacs' bankruptcy, the trustee would have been charged with the duty of collecting Kovacs' nonexempt property and administering it. If the site at issue were Kovacs' property, the trustee would shortly determine whether it was of value to the estate. If the property was worth more than the costs of bringing it into compliance with state law, the trustee would undoubtedly sell it for its net value, and the buyer would clean up the property, in which event whatever obligation Kovacs might have had to clean up the property would have been satisfied. If the property were worth less than the cost of cleanup, the trustee would likely abandon it to its prior*

*owner, who would have to comply with the state environmental law to the extent of his or its ability.* (emphasis supplied)

105 S.Ct. at 710–711.

The emphasized portions of the above-quoted language from *Kovacs* create certain anomalies in the context of the instant case. First is the concept that a remedy of injunction against a debtor who no longer owns the property which is the subject of action required by the injunction is simply a monetary claim, and that in essence an injunctive remedy is no longer available in that circumstance. Thus, as applied to the facts of the instant case, if the tanks which are the focus of Minnesota's action are no longer property of the bankruptcy estate, because the Trustee has neither a legal ownership interest nor a possessory interest in them, *Kovacs* indicates that an injunction against the Trustee to take action with respect to those tanks is not appropriate. However, the emphasized citation portion states that a Trustee in possession of the site operated by *Kovacs* would have been required to comply with the environmental laws of the State of Ohio with respect to that operation and may not "maintain a nuisance ... or refuse to remove the source of such conditions". Thus, if the tanks remain in the bankruptcy estate subject to the control of the bankruptcy trustee, *Kovacs* would appear to indicate that the trustee cannot operate the tanks in contravention of state environmental laws.[3] Finally, the Court—

---

**3.** It is interesting to note that the Supreme Court does not cite 28 U.S.C. § 959(b) at all in *Kovacs* as authority for this assertion. Moreover, under the factual circumstances of *Kovacs*, this statement is *dicta*. Finally, and interestingly, the Supreme Court hypothesized a circumstance in which a Chapter 7 trustee is able to locate a purchaser for contaminated property who, taking the costs of abating or remediating the contamination

into consideration, will pay a net value to the estate for acquisition of the property. Under this circumstance, the Court stated: "The trustee would undoubtedly sell it for its net value, and the buyer would clean up the property, in which event whatever obligation Kovacs might have had to clean up the property would have been satisfied". Again, under the factual circumstances of the case, this commentary is *dicta;* however, it is somewhat

by stating the proposition that a purchaser of a property which is known to be environmentally contaminated will discount the perceived market value of the property to account for abatement/remediation costs to be incurred by the purchaser—somewhat signaled a view of bankruptcy realism that the debtor's estate in such a situation is at most a recourse party for the expenses of abatement/remediation. This last bit of *dicta* of course argues in favor of the Trustee's motion to dismiss.

We next come to *Midlantic, supra.* To encapsulate the facts, *Midlantic* began as a Chapter 11 reorganization case filed by Quanta Resources Corporation, which processed waste oil at facilities in both New York and New Jersey. Prior to the filing of bankruptcy, the New Jersey Department of Environmental Protection had ordered Quanta to cease its operations at Edgewater due to its alleged violation of its operating permit by accepting 400,000 gallons of oil contaminated with PCB. The day after Quanta filed its Chapter 11 petition, NJDEP issued an administrative order which required the debtor to clean up the site. Within the next month, Quanta converted its Chapter 11 case to a case under Chapter 7. After Quanta had filed its Chapter 11 petition, New York environmental authorities discovered that Quanta had stored over 70,000 of PCB-contaminated oil at its New York facility. The trustee sought to sell the New York facility, but was unable to do so, and thereafter filed a motion pursuant to 11 U.S.C. § 554(a) to abandon that property. New York objected to the abandonment, essentially according to the Supreme Court, on the basis of public policy considerations,

and in addition arguing that 28 U.S.C. § 959(b) required the trustee to "manage and operate" the property of the estate "according to the requirements of the valid laws of the state in which such property is situated"; 106 S.Ct. at 758.

As stated in footnote 2 [106 S.Ct. at 758], "(t)he sole issue presented by these petitions is whether a trustee may abandon property under § 554 in contravention of local laws designed to protect the public's health and safety". The United States Bankruptcy Court had approved the abandonment petition, despite NJDEP's objection that sufficient funds existed in the estate to protect the public from the dangers posed by the hazardous PCB contamination. The evidence established that the 470,000 gallons of contaminated at the New Jersey site was in unguarded, deteriorating containers, and the trustee's abandonment of the site would have removed any form of protection previously provided against public incursion onto the site and potential contact with the environmental hazards posed by the PCB contamination.

*Midlantic* is a 5–4 decision, focused upon the issue of whether by enacting 11 U.S.C. § 554 without any restriction on abandonment for considerations of public health and welfare, the Chapter 7 trustee could abandon the subject property without taking any action to potentially protect the public from association with the contaminating agents on that property. The four dissenting justices, including the Chief Justice, were of the opinion that by enacting § 554 without any requirement conditioning abandonment on environmen-

---

illustrative of the Supreme Court's view of the relative shifting of benefits and burdens when a Chapter 7 bankruptcy estate sells property to a purchaser who may remain subject to enforcement of environmental laws for remedying environmental problems on that prop-

erty, or who may in fact undertake necessary action to conform the property to the dictates of environmental laws. The bottom line to this Court is that 28 U.S.C. § 959(b) is neither addressed in, nor implicated in any manner by, *Kovacs*.

tal law concerns, the trustee was entitled to abandon the property without taking any action whatsoever.

The majority opinion determined that Congress did not intend to grant a Chapter 7 trustee powers to abandon property in a circumstance in which the abandonment would totally contravene state or local laws designed to protect public health or safety. Interestingly, the Supreme Court again did *not* premise its decision on the provisions of 28 U.S.C. § 959(b), but rather utilized reference to that statute to support its contention that Congress did not entirely create an unfettered right of abandonment under 11 U.S.C. § 554(a), stating the following:

> Title 28 U.S.C. § 959(b) [FN7] provides additional evidence that Congress did not intend for the Bankruptcy Code to pre-empt all state laws. Section 959(b) commands the trustee to "manage and operate the property in his possession ... according to the requirements of the valid laws of the State." Petitioners have contended that § 959(b) is relevant only when the trustee is actually operating the business of the debtor, and not when he is liquidating it. Even though § 959(b) does not directly apply to an abandonment under § 554(a) of the Bankruptcy Code—and therefore does not de-limit the precise conditions on an abandonment—the section nevertheless supports our conclusion that Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of a trustee's powers.
>
> > FN7. Section 959(b) provides:
> > "Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."

106 S.Ct. at 761.

The majority opinion further supported its determination with review of Congressional policy as stated in federal environmental legislation designed to deal with toxic pollution, and concluded with the following decisional statement which has given rise to a plethora of interpretations since it was entered:

> In the light of the Bankruptcy trustee's restricted pre–1978 abandonment power and the limited scope of other Bankruptcy Code provisions, we conclude that Congress did not intend for § 554(a) to pre-empt all state and local laws. The Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety. Accordingly, without reaching the question whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself, **we hold that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards.** [FN9] Accordingly, we affirm the judgments of the Court of Appeals for the Third Circuit.
>
> > FN9. This exception to the abandonment power vested in the trustee by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fet-

tered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm.

106 S.Ct. at 762. (Emphasis supplied).

■ It is clear to this Court that the underpinning of *Midlantic* is not obligations purportedly imposed upon a Chapter 7 trustee by 28 U.S.C. § 959(b). In *Midlantic*, the trustee remained in possession and control of the subject property, and yet the majority opinion utilizes § 959(b) only as an indication of Congress' intention in a limited context concerning property of a bankruptcy estate, and not as a directly compelling statement of Congressional intent that a Chapter 7 trustee in a liquidation case comply with state or local environmental laws. This Court derives from the manner in which § 959(b) was addressed in *Midlantic* that the statute has no application to a circumstance in which a Chapter 7 trustee is merely liquidating environmentally contaminated property on which the trustee did not operate the facility giving rise to the environmental problems.

■ This Court also deems the *Midlantic* decision to stand solely for the proposition that a Chapter 7 trustee may not *abandon* property from a bankruptcy estate under 11 U.S.C. § 554(a) without taking actions necessary to *abate* conditions which pose an "imminent and identifiable harm" to "the public health or safety". Of course, these actions necessarily involve present payment for present services to be rendered to address the abatement of immediate environmental hazards, and thus the Supreme Court in essence created a class of "ordinary and necessary" Chapter 7 administration expense which supercedes and primes expenses of administration under 11 U.S.C. § 503(b).

■ Having construed *Midlantic* in the manner stated above, the application of 28 U.S.C. § 959(b) to the circumstances of this case is clear. 28 U.S.C. § 959 states:

**§ 959. Trustees and receivers suable; management; State laws**

(a) Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

(b) Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

Sub-paragraph (a) of the foregoing statute provides a rule by which a bankruptcy trustee may be sued "with respect to any of [his/her] acts or transactions in carrying on business connected with [property of the estate]", without the plaintiff's first seeking relief from the automatic stay. The critical element of this provision is that it relates only to "transactions in carrying on business"; it does not relate to actions directed against the trustee solely because certain property is property of the bankruptcy estate. Sub-paragraph (b) of the statute then states that a trustee "shall

manage and operate the property in his possession as such trustee ... according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof". The critical provision in this sub-paragraph is the phrase "manage and operate". First, it is the Court's view that sub-paragraphs (a) and (b) operate in parallel universes, i.e., one in which the trustee is actually conducting business on the property. In the context of a Chapter 7 case, this concept entails an order pursuant to 11 U.S.C. § 721 and does not encompass a situation in which a Chapter 7 trustee inherits a facility on which the business engaged in by the debtor is no longer conducted. As pointed out by MPCA, the United States Court of Appeals for the Sixth Circuit is of a different view; See, *In re Wall Tube & Metal Products Co.*, 831 F.2d 118 (6th Cir.1987). However, by far the overwhelming authority established by federal courts is that § 959(b) does not apply to the trustee in a Chapter 7 case unless the trustee continues to operate the debtor's business; *In re Campbell*, 13 B.R. 974 (Bankr.D.Idaho 1981); *In re Borne Chemical Co., Inc.*, 54 B.R. 126 (Bankr.D.N.J.1984); *In re Scott*

*Housing Systems, Inc.*, 91 B.R. 190 (Bankr.S.D.Ga.1988); *In re Microfab, Inc.*, 105 B.R. 161 (Bankr.D.Mass.1989); *In re Valley Steel Products Co., Inc.*, 157 B.R. 442 (Bankr.E.D.Mo.1993).[4]

■ The Court thus determines that 28 U.S.C. § 959(b) has no application to the circumstances addressed by MPCA's complaint.

One final source of authority posited by MPCA must be addressed: 11 U.S.C. § 105(a). That section provides:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

In parallel with its invocation of § 105(a), MPCA argues that federal bankruptcy courts are essentially courts of equity, and that their principal mission is to do equity and justice in any particular circumstance presented to them.

---

4. The case of *In re Environmental Waste Control, Inc.*, 125 B.R. 546 (N.D.Ind.1991) is not to the contrary. In that case—with which the author of this decision is thoroughly familiar—the United States District Court for the Northern District of Indiana had entered a judgment against the debtor requiring both abatement and remediation action with respect to a waste disposal site. The debtor filed a Chapter 11 case, and, while still in the Chapter 11 case, applied to the Bankruptcy Court for an order relieving it of its obligation to comply with the remediation provisions of the pre-petition judgment. The United States District Court which had entered the pre-petition judgment—without specific citation of the statute—held in essence that an imminent danger to public health had been demonstrated on the record, and that the debtor-in-

possession was required to utilize its remaining funds to comply with the pre-petition judgment order. Properly construed, this decision stands for the proposition that an entity subject to a court's remediation and abatement judgment which then files a Chapter 11 case and continues in possession and control of its property must continue to comply with the terms of that judgment subsequent to the filing of the Chapter 11 petition when an imminent danger arises from non-compliance. The decision has no implications with respect to a Chapter 7 trustee who merely possesses property of the debtor but does not operate the pre-petition debtor's business, and does not inherit a circumstance in which the property was the subject to a pre-petition judicial abatement/remediation order.

First, with all sincere respect to Minnesota's status as a sovereign state intent upon doing justice for its citizens, federal bankruptcy courts are *not* courts of equity, but rather are statutory courts whose powers are provided by and circumscribed by Acts of Congress. As Article I courts rather than Article III courts, federal bankruptcy courts do not derive the underpinning of their existence and jurisdiction from the United States Constitution, but rather derive their powers solely from legislation of the United States Congress which defines the scope of their authority. United States Bankruptcy Courts must specifically follow Congressional enactments which state the scope of their powers. As stated in *In the Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Company*, 791 F.2d 524, 528 (7th Cir.1986):

> CMC's appeal to equity is misplaced for another reason. The fact that a proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be. See *Shondel v. McDermott*, 775 F.2d 859, 867–68 (7th Cir.1985); *Piper Aircraft Corp. v. Wag–Aero, Inc.*, 741 F.2d 925, 939 (7th Cir.1984) (concurring opinion). The function of equitable considerations in a bankruptcy proceeding is to guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted. See *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 565 (7th Cir.1986).

In addition, as has been recently made clear by the United States Court of Appeals for the Seventh Circuit, the powers of a federal bankruptcy court under 11 U.S.C. § 105(a) are supplemental to the implementation of specific provisions of the Bankruptcy Code and other law, and are not meant to be an independent source of law-making. As stated in *In re Kmart Corporation*, 359 F.3d 866, 871 (7th Cir. 2004):

> Section 105(a) allows a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Code. This does not create discretion to set aside the Code's rules about priority and distribution; the power conferred by § 105(a) is one to implement rather than override. See *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir.1993). Cf. *United States v. Noland*, 517 U.S. 535, 542, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996). Every circuit that has considered the question has held that this statute does not allow a bankruptcy judge to authorize full payment of any unsecured debt, unless all unsecured creditors in the class are paid in full. See *In re Oxford Management Inc.*, 4 F.3d 1329 (5th Cir.1993); *Official Committee of Equity Security Holders v. Mabey*, 832 F.2d 299 (4th Cir.1987); *In re B & W Enterprises, Inc.*, 713 F.2d 534 (9th Cir.1983). We agree with this view of § 105. "The fact that a [bankruptcy] proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be." *In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524, 528 (7th Cir.1986).

11 U.S.C. § 105(a) provides no authority for the relief requested by MPCA in its adversary complaint.

Putting the analysis stated above together, the Court determines that the principles applicable to this adversary proceeding are the following:

1. 28 U.S.C. § 959(b) has no application to the circumstances of this case, and the Chapter 7 Trustee, by operation of that statute, is not subject to the laws of the State of Minnesota with respect of abatement of alleged environmental contamination arising from storage tanks located on real property previously owned by Globe Building Materials, Inc. which was sold by the Trustee pursuant to 11 U.S.C. § 363 during the pendency of the Trustee's administration of the Chapter 7 case of that debtor.

2. By combining *Kovacs* and *Midlantic, to the extent that the Trustee retains ownership and control* over storage tanks which give rise to an "imminent and identifiable harm" to "public health or safety" due to present and foreseeably continuing seepage of contaminants from those tanks, the Trustee may be required to abate the circumstances giving rise to such harm by contracting with third parties to perform abatement procedures to the extent necessary to cause the circumstances to no longer constitute "imminent and identifiable harm" to "public health or safety". Once the circumstances are so abated, the Trustee is not subject to an injunction order: remediation is not compellable.

3. Even if the Trustee retains ownership and control over the tanks, the Trustee may be required to abate the circumstances giving rise to such harm *if and only if* the sales transaction between the Trustee and the Port Authority of the City of St. Paul did not contemplate and provide that the purchaser would be responsible for the abatement of such hazards, and then only if the Trustee has access, under applicable law, to the property upon which the tanks are located [The Trustee cannot be compelled to perform an act which constitutes trespass on the property of another entity.]; *See, Kovacs, supra.; Midlantic, supra.; In re Shore Co., Inc.,* 134 B.R. 572 (Bankr.E.D.Tex.1991); *In re Kent Holland Die Casting & Plating, Inc.,* 125 B.R. 493 (Bankr.W.D.Mich.1991).[5]

In the Court's view, the foregoing analysis melds, as much as can be done at this time, the concepts of Chapter 7 case administration under the Bankruptcy Code with controlling law established by the United States Supreme Court concerning environmental enforcement issues arising in bankruptcy cases. As very cogently stated by Judge Thomas S. Utschig of the Western District of Wisconsin in *In re H.F. Radandt, Inc.,* 160 B.R. 323, 328 (Bankr.W.D.Wis.1993):

> Environmental contamination is without question a compelling concern. The Court nevertheless believes it is for Congress, not the courts, to address and resolve the apparent conflict and confusion between state environmental laws, *Midlantic* and its progeny, and the dictates of the Bankruptcy Code.

Applying the foregoing legal analysis to the record in this adversary proceeding, the Trustee's motion to dismiss must be denied. MPCA's complaint is suffi-

---

5. This decision does not address a possible circumstance in which the sale contemplated abatement by the purchaser but the purchaser refuses or is unable to do so. As stated, MPCA's request for injunctive relief in the practical, real sense of environmental enforcement is essentially a demand that the debtor's bankruptcy estate pay for the abatement in contrast to the State of Minnesota doing so. Obviously, abatement action will be performed by a state-approved contractor, and not by an officer of the bankruptcy estate. In the foregoing circumstance, an injunction action requiring the Trustee to so contract will not lie. However, under certain circumstances, it may be possible for Minnesota to assert a claim under 11 U.S.C. § 503(b)(1) in this context if Minnesota ends up "footing the bill" for abatement; it may not be possible to do so—the issue is not before the Court.

cient to allege that the contamination problems arising from alleged seepage from, and continued storage in, both surface and underground tanks on Globe's former St. Paul industrial site gives rise to an imminent and identifiable harm to public health or safety. The record before the Court[6] does not establish whether or not the sale of that facility to the Port Authority of the City of St. Paul included the sale of the subject tanks to that purchaser; or, if so included, the circumstances, including the parties' agreement, as to possible abatement of environment hazards arising from seepage from the tanks. If the sale of the subject facility did include sale of the subject tanks to the purchaser, then MPCA will not succeed in obtaining the relief requested by its complaint in this adversary proceeding. If the subject sale did not include some or all of the tanks—and/or if included, the sale did not contemplate the purchaser's abatement of the contaminating source—*and* if MPCA establishes that seepage from, or continued storage in, those tanks of product constitutes an imminent and identifiable harm to public health or safety—then the Trustee will be required to undertake abatement action to the extent necessary to eliminate such imminent and identifiable harm—by the employment of third party entities—**if** the Trustee has access to the subject tanks under the terms of the contract for sale of the real property upon which the tanks are located as determined by that contract and by otherwise applicable law.

### V. *Conclusion*

IT IS ORDERED that the Trustee's motion to dismiss is denied.

IT IS FURTHER ORDERED that a telephonic conference will be held on **August 30, 2006, at 10:00 A.M.** with counsel

for the plaintiff and counsel for the defendant to determine the course of further proceedings with respect to the complaint.

---

6. The record before the Court on the Trustee's motion does not include the contract between the Trustee and the Port Authority of the City of St. Paul.